IN THE
**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 CR 747 |
| | ) | Judge David Coar |
| JERROD SANDERS, | ) | |
| Defendant. | ) | |

### JERROD SANDERS' MOTION TO SUPPRESS STATEMENTS

JERROD SANDERS, by the Federal Defender Program and its attorney

IMANI CHIPHE, moves this Honorable Court, pursuant to the Fifth Amendment

of the United States Constitution and Federal Rules of Criminal Procedure

12(b)(3)(C)and 41(h), to suppress the alleged statements made by Mr. Sanders

during interrogation, while in the custody of the Chicago Police Department on

July 14, 2007, because they were involuntary and violate the principles of *Miranda*

*v. Arizona*, 384 U.S. 436 (1966). In support of this motion, Mr. Sanders states as

follows:

## I.    INTRODUCTION

Mr. Sanders is currently charged in a one-count indictment for his alleged

possession of a firearm that was in and affecting commerce on July 14, 2007, after

having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g).

Chicago Police Department (CPD) officers were in possession of a search warrant to search the premises located at 5950 S. Union Avenue, Chicago, Illinois.  The officers assert that on July 14, 2007, they executed the warrant at 5950 S. Union Ave.  The officers entered the residence through the lower rear door that led to the basement.  There were a number of people in the basement of the residence. After entering the basement CPD Officer Tyrone Pendarvis allegedly recovered one firearm from the person of Mr. Sanders.   Mr. Sanders was handcuffed and placed in under arrest.  CPD Officer Michael Kocanda allegedly read *Miranda* rights to Mr. Sanders and two other suspects while waiting for a CPD vehicle to transport Mr. Sanders and the other suspects to CPD Area Two station.  Mr. Sanders did not waive his Miranda rights.

    After arriving at Area Two station  Officer Kocanda allegedly *Mirandized* Mr. Sanders again.  Mr. Sanders did not waive his rights. Officer Kocanda then questioned Mr. Sanders  about the gun that was found.  Officer Kocanda alleges that Mr. Sanders admitted to possessing the firearm found by Officer Pendarvis stating that Mr. Sanders "knew it was wrong to have the gun and did not know why he had it". *Exhibit. A* (ATF Report of Investigation– Kocanda).   Officer Kocanda interrogated Mr. Sanders alone in a vacant room in the station.  Officer Kocanda asserts that he took notes of his interrogation of Mr. Sanders, but later

destroyed the notes after his case reports were finished and approved. *Exh. A.*

Officer Pendarvis asserts that after he recovered the firearm from Mr. Sanders, he asked Mr. Sanders if he had any more guns.  According to Officer Pendarvis Mr. Sanders stated that he did not have any more guns.  In addition, Officer Pendarvis asked Mr. Sanders why was he moving around and not obeying police orders to get on the floor.  Officer Pendarvis alleges that Mr. Sanders told him that the reason he was moving around and had his hands in his pocket was because he was trying to indicated to the officers that he had a gun. *Exhibit B* (ATF Report of Investigation– Pendarvis).  Officer Pendarvis did not read Mr. Sanders his Miranda rights.  *Exh.  B.*

On November 13, 2007, Mr. Sanders was charged with a one count indictment for violating 18 U.S.C. § 922(g)(1).  He has pled not guilty to the charge.

Mr. Sanders now seeks a hearing to suppress the alleged statements he made to CPD Officers Kocanda and Pendarvis on July 14, 2007, from being used during the trial in this matter based on the fact that the officers failed to properly give Mr. Sanders his *Miranda* rights, and that Mr. Sanders  did not waive his *Miranda* rights.  Specifically, it now appears that key facts requiring court resolution prior to trial are in substantial dispute, and as a result, we seek an

evidentiary hearing as a matter of law. *See United States v. Harris*, 914 F.2d 927,

933 (7th Cir. 1990); *United States v. Berkowitz*, 927 F.2d 1376 (7th Cir. 1990); *United

States v. Randle*, 966 F.2d 1209 (7th Cir. 1992).

## DISCUSSION

**I.    Individuals who are in Custody Cannot Be Interrogated Without
       Receiving Adequate Warning as to their Rights Under the Constitution.**

*Miranda v. Arizona* provides the rule that if a suspect is in custody, he or

she must be informed *prior to questioning by law enforcement*, that he/she has

certain rights under the Constitution. *Miranda v. Arizona*, 384 U.S. 436, 444-45

(1966) (emphasis added). After *Miranda*, the Supreme Court expressed that

whenever the court finds that a person is in custody, and that person is subjected

to either express questioning *or* its functional equivalent, certain safeguards are

required. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (emphasis added).

While it is not mandatory for officers to give a suspect a verbatim recitation

of the warnings to satisfy *Miranda*, it has been held that the warnings must be

given in some form so that, ultimately, the defendant is fully and truly aware of

his or her constitutional rights. *See California v. Pyrsock*, 453 U.S. 355, 359, 361

(1981) (admonishment by the officers must reasonably convey the constitutional

rights to the defendant.)  Likewise, while there is no requirement that the waiver

be documented in writing, *Miranda* was designed to "vest a suspect in custody

with an added measure of protection against coercive police practices, without

regard to objective proof of the underlying intent of the police." *North Carolina v.*

*Butler*, 441 U.S. 369 (1979).

The burden of proof rests entirely with the government to prove that actual

compliance with *Miranda* occurred. *Lego v. Twomey*, 404 U.S. 477, 484 (1972). This

is additional to any burden the government would have to prove that a

confession was voluntary, if it seeks to introduce an alleged confession into

evidence. *Colorado v. Connelly*, 479 U.S. 157, 169 (1986). Yet if interrogation

occurs without the presence of an attorney, and a statement is subsequently

given, "a *heavy burden* rests on the government to demonstrate that the defendant

knowingly and intelligently waived his privilege against self-incrimination and

his right to retained or be appointed counsel." *Miranda*, 384 U.S. at 475 (emphasis

added).

A voluntarily statement "without any compelling influences" might be

admissible in evidence, but the court should not simply presume there was a

valid waiver "from the fact that a confession was in fact eventually obtained." *Id.*

The court's determination should be made from the perspective of a reasonable

person in the shoes of the suspect. *United States v. Huerta*, 239 F.3d 865, 871 (7th

Cir. 2001). That is, whether a *Miranda* waiver was knowingly and intelligently

given depends upon the particular facts and circumstances of each case,

"including the background, experience, and conduct of the accused." *See Minnick*

*v. Mississippi*, 498 U.S. 146, 159 (1990) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464

(1938)).

**A.     It cannot be disputed that Jerrod Sanders was in custody.**

Here, there can be no dispute that Mr. Sanders was in custody. He was

handcuffed, placed under arrest and transported by CPD officers to Area Two

station. Officer Kocanda questioned Mr. Sanders while he was under arrest and

in custody, in a vacant room at Area Two station. Officer Pendarvis questioned

Mr. Sanders while he was in handcuffs, after allegedly recovering the firearm

from Mr. Sanders.

**B.     Jerrod Sanders was subject to interrogation while in custody, yet
the government cannot meet its burden of proving *Miranda*
warnings were given by the officers or that Mr. Sanders waived
his *Miranda* rights, prior to any statements**

Mr. Sanders was subjected to police interrogation. Yet it is the government

burden to prove to this Court that any incriminating statements made by a

defendant, in response to questioning by officers, was done only after knowing

he had constitutional rights and waiving those rights. The government must

6

show, in turn, that the waiver was voluntary and not the result of coercion.

The only evidence received from the government related to *Miranda* warnings given Mr. Sanders by CPD officers is a statement in the police reports that Mr. Sanders was read his "rights" before being questioned by Officer Kocanda. Exh. A. The reports indicate that at some point after being *read* his rights Mr. Sanders made incriminating statements admitting that he possessed the firearm in this case. However, there is no evidence that Mr. Sanders waived his rights pursuant to *Miranda*. In addition Officer Pendarvis never gave Mr. Sanders his *Miranda* rights. Exh. B.

Additionally, beyond failing to get a *Miranda* waiver, orally or written, the Officers failed to obtain a written statement from Mr. Sanders, failed to have Mr. Sanders sign or memorialize an alleged statement, and failed to obtain an audiotaped or videotaped oral confession from Mr. Sanders.

Mr. Sanders asserts that the government cannot meet the stringent requirements of *Miranda v. Arizona* here, and any statements made by Mr. Sanders must be suppressed as tainted fruit of the poisonous tree.

## CONCLUSION

WHEREFORE, for the reasons outlined above, Mr. Sanders respectfully

requests that this Court suppress the statements he allegedly made on July 14,

2007, because they were obtained in violation of Mr. Sanders's rights pursuant to

*Miranda v. Arizona*.  In the alternative, Mr. Sanders requests that this Court hold

an evidentiary hearing on the matter.  Mr. Sanders also respectfully seeks leave

to file additional points of law or memoranda upon receipt of additional

information.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
Terence F. MacCarthy
Executive Director

By:   s/*Imani Chiphe*
         Imani Chiphe

IMANI CHIPHE
FEDERAL DEFENDER PROGRAM
55 E. Monroe Street, Suite 2800
Chicago, IL 60603
312/621-8300

## CERTIFICATE OF SERVICE

The undersigned, Imani Chiphe , an attorney with the Federal Defender Program hereby certifies that in accordance with FED.R.CRIM. P. 49, FED. R. CIV. P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

## JERROD SANDER'S MOTION TO SUPPRESS STATEMENTS

was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on August 11 , 2008, to counsel/parties that are non-ECF filers.

By:    s/Imani Chiphe
       IMANI CHIPHE
       FEDERAL DEFENDER PROGRAM
       55 E. Monroe St., Suite 2800
       Chicago, Illinois 60603
       (312) 621-8349

## CERTIFICATE OF SERVICE

The undersigned, Imani Chiphe , an attorney with the Federal Defender Program hereby certifies that in accordance with FED.R.CRIM. P. 49, FED. R. CIV. P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

### JERROD SANDERS' MOTION TO SUPPRESS STATEMENTS

was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on August 11 , 2008, to counsel/parties that are non-ECF filers.

By:     s/Imani Chiphe
        IMANI CHIPHE
        FEDERAL DEFENDER PROGRAM
        55 E. Monroe St., Suite 2800
        Chicago, Illinois 60603
        (312) 621-8349

STATE OF ILLINOIS           )
                            )      SS.
COUNTY OF COOK              )

## AFFIDAVIT OF JERROD SANDERS

  I, Jerrod Sanders, being first duly sworn and on oath states as follows:

1. On July 14, 2007, I was in the apartment of 5950 S. Union Street, when police officers from the Chicago Police Department entered.

2. The officers told everyone in the house to get down on the floor.  I obeyed the officers.  The officers searched the apartment as well as the person of everyone in the apartment.

3. After searching the apartment the officer placed me and others in the apartment under arrest and took us to Area Two headquarters.

4. I did not answer the questions of any Chicago Police Department officer nor did I waive my *Miranda* rights.

5. At no time did I confess to having a gun in my possession on July 14, 2007.

FURTHER AFFIANT SAYETH NOT.

_Jerrod Sanders_
Jerrod Sanders

Subscribed and sworn to before me

this 11th day of August, 2008

NOTARY PUBLIC

OFFICIAL SEAL
ISABEL ANTUNEZ
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/19/11

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 CR 747 |
| | ) | Judge David Coar |
| JERROD SANDERS, | ) | |
| Defendant. | ) | |

## Table of Exhibits to Jerrod Sanders' Motion to Suppress Statements

EXHIBIT  A        ATF Report of Investigation– Kocanda

EXHIBIT  B        ATF Report of Investigation - Pendarvis

# EXHIBIT   A

# ATF Report of Investigation– Kocanda

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

## Report of Investigation

| Title of Investigation:<br>SANDERS, Jerrod (PSN) | Investigation Number:<br>772010-08-0004 | Report Number:<br>3 |
|---|---|---|

## SUMMARY OF EVENT:

On October 15, 2007, at approximately 10:00 am, Special Agent (SA) Hamilton Beal and Assistant United States Attorney (AUSA) Julie Ruder interviewed Chicago Police Officer Michael Kocanda. The interview was conducted in AUSA Ruder's office.

## NARRATIVE:

1. On October 15, 2007, at approximately 10:00 am, SA Hamilton Beal and AUSA Julie Ruder interviewed Chicago Police Officer Michael Kocanda. Officer Kocanda is assigned to Chicago Police Department's (CPD) Area Two Gun Team. The purpose of the interview was to learn more information about the arrest of Jerrod SANDERS during a Chicago Police search warrant on July 14, 2007. Officer Kocanda was the affiant for the search warrant.

2. Officer Kocanda described the background of the case; Officer Kocanda stated that he applied for a search warrant at 5950 S. Union Ave., Chicago, IL 60621 based on information he received from a Confidential Informant (CI). The CI had informed Officer Kocanda that illegal narcotics were being sold out of the basement at the above listed address. Officer Kocanda said that the CI was reliable and that the CI had provided accurate information at least five times in the past. The CI was working for Officer Kocanda in exchange for monetary compensation.

3. Officer Kocanda stated that on July 14, 2007, the warrant was executed at 5950 S. Union Ave. Officer Kocanda, along with other CPD Officers assigned to the Area 2 Gun Team, entered the residence through the lower rear door that lead to the basement, after announcing "Police, Search Warrant!" Officer Kocanda said that there were a lot of people in the basement and that a large quantity of drugs and three firearms were found. The first firearm was found on a man later identified as Darryl Rodgers, who was stationed at the entrance of the basement. Officer West recovered the weapon from Rodgers.

4. When asked specifically about SANDERS, Officer Kocanda said that SANDERS was seated on a couch in a room in the back of the basement. Officer Kocanda said that he (Kocanda) did not personally recover any firearms and that Officer Tyrone Pendarvis recovered one firearm from SANDERS. Officer Kocanda said that he heard Officer Pendarvis announce words to the effect of, "I've got another gun" during the search, referring

| Prepared by:<br>Hamilton Beal | Title:<br>Special Agent, Chicago I (ICDE) Field Office | Signature:<br>*[signature]* | Date:<br>11/6/07 |
|---|---|---|---|
| Authorized by:<br>Paul D. Vanderplow<br>*Chris Bayless (acting)* | Title:<br>Group Supervisor, Chicago I (ICDE) Field Office | Signature:<br>*[signature]* | Date:<br>11/6/07 |
| Second level reviewer (optional):<br>Andrew L. Traver | Title:<br>Special Agent in Charge, Chicago Field Division | Signature: | Date: |

ATF EF 3120.2 (10-2004)
For Official Use Only

| Title of Investigation:<br>SANDERS, Jerrod (PSN) | Investigation Number:<br>772010-08-0004 | Report Number:<br>3 |
|---|---|---|

to Pendarvis's discovery of the weapon on SANDERS. The third firearm was found on the same couch that SANDERS was sitting on. Officer Kocanda said that SANDERS was arrested along with six other subjects.

5.  Officer Kocanda stated that while waiting for a prisoner transport, Officer Kocanda read miranda rights to SANDERS and two other subjects. A transport wagon transported SANDERS and the other arrestees to the CPD Area Two station. Officer Kocanda stated that SANDERS said nothing to him prior to being mirandized.

6.  Once at the Area Two station, Officer Kocanda mirandized SANDERS again and then spoke to him in a vacant room in the station. Officer Kocanda stated that SANDERS admitted that the firearm recovered from his person belonged to him and that SANDERS knew it was wrong to have the gun and did not know why he (SANDERS) had it. Officer Kocanda said that he took notes while he was speaking with SANDERS, but later destroyed them after all case reports were finished and approved. Officer Kocanda said that destroying notes is standard practice when they are no longer needed.

ATF EF 3120.2 (10-2004)<br>For Official Use Only

US00136

# EXHIBIT   B

# ATF Report of Investigation - Pendarvis

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Investigation

| Title of Investigation:<br>SANDERS, Jerrod (PSN) | Investigation Number:<br>772010-08-0004 | Report Number:<br>5 |
|---|---|---|

## SUMMARY OF EVENT:

On October 22, 2007, at approximately 11:00 am, Special Agent (SA) Hamilton Beal and Assistant United States Attorney (AUSA) Julie Ruder interviewed Chicago Police Officer Tyrone Pendarvis. The interview was conducted in AUSA Ruder's office.

## NARRATIVE:

1.  On October 22, 2007, at approximately 11:00 am, SA Hamilton Beal and AUSA Julie Ruder interviewed Chicago Police Officer Tyrone Pendarvis. Officer Pendarvis is assigned to Chicago Police Department's (CPD) Area Two Gun Team. The purpose of the interview was to learn more information about the arrest of Jerrod SANDERS during a Chicago Police search warrant on July 14, 2007.

2.  Officer Pendarvis stated that he was assigned as a door breacher when the warrant was executed at 5950 S. Union Ave., Chicago, IL 60621, on July 14, 2007. After Officer Wallace knocked and announced, Officer Pendarvis then used a ram to force entry to the rear lower door of the residence. Officer Pendarvis said that he then moved out of the way to allow other members of the entry team to go inside while Officer Pendarvis put the ram down. Officer Pendarvis said he then entered the residence behind the other CPD officers and went to a room furthest away from the door he entered.

3.  Officer Pendarvis said that there were about 10 people in the room and two couches. Officer Pendarvis gave verbal commands stating that he was the police and for everyone to get down on the floor. Everyone in the room, except a man later identified as SANDERS and a woman later identified as Daphne Green, complied with Officer Pendarvis's orders and got on the floor. As to Green, Officer Pendarvis stated that Green kept talking, saying words to the effect of, I don't know what to, I've never done this before. As to SANDERS, Officer Pendarvis stated that SANDERS was moving his hands around near his pants pockets and then stood up. SANDERS continued to move around and ignored Officer Pendarvis's orders for him to get on the ground. Officer Pendarvis then holstered his duty firearm, grabbed SANDERS, and directed SANDERS to the ground and handcuffed SANDERS.

4.  Officer Pendarvis then patted SANDERS for weapons and found a 9mm Hi-Point, semi-automatic pistol in SANDERS's right front pants pocket. Officer Pendarvis said that he made the firearm safe (unloaded it and

| Prepared by:<br>Hamilton Beal | Title:<br>Special Agent, Chicago I (ICDE) Field Office | Signature: | Date:<br>11/6/07 |
|---|---|---|---|
| Authorized by:<br>Paul D. Vanderplow<br>*Chris Baykess (acting)* | Title:<br>Group Supervisor, Chicago I (ICDE) Field Office | Signature: | Date:<br>11-6-07 |
| Second level reviewer (optional):<br>Andrew L. Traver | Title:<br>Special Agent in Charge, Chicago Field Division | Signature: | Date: |

Page 1 of 2

ATF EF 3120.2 (10-2004)
For Official Use Only

US00139

| Title of Investigation:<br>SANDERS; Jerrod (PSN) | Investigation Number:<br>772010-08-0004 | Report Number:<br>5 |
| --- | --- | --- |

locked the slide to the rear) and then called for Officer Kocanda. Officer Pendarvis stated that he showed the pistol to Officer Kocanda and then Officer Pendarvis put the pistol, magazine and ammunition in his pocket. When questioned about possible mixing of ammunition, magazines and the firearm, Officer Pendarvis stated that he carries his duty weapon in his holster and his magazines and ammunition in a pouch on his duty belt. Officer Pendarvis said that he does not carry any loose ammunition in his pockets and that the firearm, magazine and ammunition that he put in his pocket and later turned in as evidence, were the same firearm, magazine and ammunition that Officer Pendarvis recovered from SANDERS's person.

5.  Officer Pendarvis said that after he recovered the firearm from SANDERS, he asked SANDERS if he had any more guns and SANDERS said no. Officer Pendarvis then told SANDERS that SANDERS is lucky that Officer Pendarvis did not shoot him, that SANDERS should obey police orders, and then asked why SANDERS would do something like that (referring to SANDERS moving around and not getting on the floor when told). Officer Pendarvis stated that SANDERS then said that the reason SANDERS was moving around and putting his hands near his pockets was because SANDERS was trying to tell Officer Pendarvis that SANDERS had a gun.

6.  Officer Pendarvis stated that he did not read SANDERS miranda rights prior to asking if SANDERS had any more guns and why SANDERS did not comply with police orders. Officer Pendarvis said that he asked SANDERS if he had any more guns for officer safety reasons. Officer Pendarvis also said that when he asked SANDERS why he did not listen to the orders to get on the floor, Officer Pendarvis did not intend to question SANDERS about the gun, but was simply trying to convey to SANDERS that he should comply with police orders. Officer Pendarvis said he did not expect SANDERS to say anything in response; Officer Pendarvis was more scolding SANDERS for putting himself and the officers in a dangerous situation.

7.  After everyone in the basement was secured, Officer Pendarvis found a revolver on the floor, next to the end of the couch where SANDERS was sitting when Officer Pendarvis entered the room. Officer Pendarvis stated that at no time did he see SANDERS in possession of the revolver and that nobody else claimed ownership of the revolver.

8.  Officer Pendarvis said that he assisted with prisoner processing after SANDERS and the other arrestees were transported to the Area Two station. Officer Pendarvis stated that at one point during the processing, he joked with SANDERS saying words to the effect of; "So you were going to shoot me, huh?" Officer Pendarvis said SANDERS replied by saying that SANDERS was not going to shoot Officer Pendarvis and then again, SANDERS explained his movement on the couch and non-compliance with Officer Pendarvis's orders by saying that SANDERS was trying to tell Officer Pendarvis that SANDERS had a gun.

9.  Officer Pendarvis stated that he was not present when Officer Kocanda interviewed SANDERS.

10. While speaking with SA Beal and AUSA Ruder, Officer Pendarvis drew a sketch of the basement of the residence and the room that he arrested SANDERS in. The sketch was to assist SA Beal and AUSA Ruder in understanding the scene at the time of SANDER's arrest.

Attachment: Sketch done by Officer Pendarvis.

ATF EF 3120.2 (10-2004)
For Official Use Only

US00140