UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 07 CR 747 |
| | ) | Hon. David H. Coar |
| JERROD SANDERS | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS**

### I.    Introduction

Defendant Jerrod Sanders has moved to suppress several statements he made after his July 14, 2007 arrest for illegally possessing a firearm.  Defendant asserts that the statements he made immediately after his arrest (that he was moving around to signal to the officer that he had a gun and he did not have any more guns) should be suppressed because the police officer making the arrest, Officer Tyrone Pendarvis, did not read defendant his *Miranda* rights.  The government agrees that Officer Pendarvis did not read defendant his *Miranda* rights, but defendant's statements are admissible because they were in response to a permissible question affecting public safety, voluntary, and not the result of interrogation.

Defendant also asserts that statements he made to Officer Pendarvis and Officer Kocanda at the police station (that he was not going to shoot Officer Pendarvis, knew it was wrong to have a gun, and did not know why he had it) should be suppressed because defendant had not been read his *Miranda* rights.  The evidence shows, however, that defendant was read his rights prior to being transported to the police station, and Officer Kocanda read defendant his *Miranda* rights again prior to any questioning at the police station.  Officer Kocanda will testify that he read defendant his *Miranda* rights from a pre-printed card at the police station and that defendant voluntarily waived

1

those rights.  The government respectfully requests, therefore, that defendant's motion be denied.

## II.    Factual Background

### *Defendant's Statements During the Search of 5950 S. Union*

In July 2007, Officer Kocanda sought and obtained a search warrant for an apartment at 5950 S. Union Street in Chicago.  The  warrant was based on information Officer Kocanda  had received that drugs were being sold out of the apartment.  Officers also had information that an individual was running an after-hours nightclub and bar out of the apartment where drugs were used and sold. On July 14, 2007 at around 9:15 a.m., members of the Chicago Police Department's Area 2 Gun Team executed the search warrant. After the officers knocked and announced their presence, and Officer Tyrone Pendarvis used a ram to make entry, he and other officers entered the apartment.

Officer Pendarvis and another officer proceeded through a doorway off of the main room, where they saw some people.  Officer Pendarvis and the other officer told everyone to get down and show their hands (so that they could secure the scene for their safety).  All but two people complied. One of the individuals, a woman, seemed confused and repeatedly said things to the effect of, I don't know what do, I've never been in this situation before.  The other individual, the defendant, was sitting on one of two couches in the room.  As soon as Officer Pendarvis entered the room, defendant began fumbling with his pockets.  Officer Pendarvis repeatedly told defendant to put his hands up and get down on the floor.  Instead, defendant stood up.  Officer Pendarvis again ordered defendant to get on the ground but defendant did not comply.

Officer Pendarvis then holstered his weapon, forced defendant to the ground, and placed him in handcuffs.  Once defendant was in handcuffs, Officer Pendarvis patted down defendant and discovered a loaded semi-automatic hand gun in defendant's pocket with a bullet in the chamber.

Officer Pendarvis made the gun safe by ejecting the bullet from the chamber and removing the magazine.  Officer Pendarvis scolded defendant for failing to obey the order to get down and told him that he was lucky he did not get shot.  While scolding him, Officer Pendarvis said words to the effect of, why didn't you follow my directions, what the hell were you thinking, and I could've shot you.  Defendant responded by saying that he was moving around and putting his hands near his pocket because he was trying to tell the officer that he had a gun.  Officer Pendarvis then asked defendant whether he had any more guns, and defendant said no.  Officer Pendarvis then noticed a revolver on the floor near the defendant.  Defendant denied that the revolver was his.  Defendant was subsequently placed under arrest for illegally possessing the firearm that was found in defendant's pocket.  An officer read defendant his *Miranda* rights as he was waiting to be transported to Area 2 headquarters.

### Defendant's Statements at the Police Station

Defendant and the other individuals arrested were transported to the Area 2 office.  At the station, as defendant was being processed, and after seeing his criminal history, Officer Pendarvis joked to defendant words to the effect of, so you were going to shoot me, huh?  Defendant replied with words to the effect that he was not going to shoot the officer and he knew he was in trouble for being a felon in possession of a weapon. Officer Kocanda then took defendant into an empty room in the police station to ask him for information about the gun found in his possession. Officer Kocanda again read defendant his *Miranda* rights from a pre-printed form contained in a Fraternal Order of Police handbook. Defendant admitted that the firearm Officer Pendarvis found in his possession was his, and that he (defendant) knew it was wrong for him to have a gun.

III.    **Analysis**

A.    **Defendant's Statements at the Union Street Apartment Were Not the Result of Interrogation Requiring *Miranda* Warnings.**

1.    **The Public Safety Exception Allowed Officer Pendarvis to Ask a Defendant If He Had Additional Guns Without Giving a *Miranda* Warning.**

Defendants who are in custody must be read their rights before they are interrogated. *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). The Supreme Court has recognized, however, a public-safety exception to the *Miranda* rule, whereby police officers can question subjects in custody about issues affecting officer and public safety prior to the issuance of *Miranda* warnings. *New York v. Quarles*, 467 U.S. 649 (1984). In *Quarles*, the police responded to a call of a man with a gun in a supermarket. *Id.* at 652. Responding officers saw a man matching the suspect's description who then ran toward the rear of the store. *Id.* The officers lost sight of the suspect for a moment and then regained sight of him; they ordered him to put his hands up and placed him in custody. *Id.* The arresting officer frisked the suspect, found that he was wearing an empty shoulder holster, and asked where the gun was. *Id.* The defendant nodded in the direction of some empty cartons and responded, "The gun is over there." *Id.* Officers then recovered a loaded .38-caliber revolver from one of the cartons. *Id.* The suspect had not been read his *Miranda* rights before being asked these questions. *Id.*

The Supreme Court held that "the doctrinal underpinnings of *Miranda* [do not] require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety." *Id.* at 656. Officer Pendarvis's question to the defendant regarding whether he had any more guns was reasonably prompted by a concern for public safety so as to bring the question and answer within the scope of the exception established in *Quarles*.

Officer Pendarvis, having just been forced to struggle with defendant so that defendant would comply with the officers' directions, and having found a loaded gun in defendant's pocket, had every reason to believe that there could be more guns in the area. The possibility of additional unknown firearms in the apartment created an obvious danger to the officers on the scene and the other people in the apartment. *See Quarles*, 467 U.S. at 657 (an unknown gun "obviously posed more than one danger to the public safety; an accomplice might make use of it, a customer or employee might later come upon it"). Officer Pendarvis's question to defendant was entirely appropriate and necessary to ensure the safety of everyone in the apartment and did not require that prior *Miranda* warnings be given.

      **2.**     **Officer Pendarvis's Exchange With Defendant Immediately After His Arrest Was Not An Interrogation**.

Not all statements made by custodial defendants are the result of interrogation. "Interrogation" means "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the subject." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Courts look to whether a "reasonable objective observer" would have believed that the questions asked would have been reasonably likely to elicit an incriminating response. *United States v. Westbrook*, 125 F.3d 996, 1002 (7th Cir. 1997). The Seventh Circuit has held that "brief informational questions that are not designed to elicit incriminating statements can be proper." *Id.* at 1003.

Office Pendarvis did not interrogate defendant so as to require prior *Miranda* warnings. Officer Pendarvis will testify that the situation in the room when defendant failed to comply with the officers' directions to get down and, instead, *stood up* while fumbling with his pocket, was extremely tense. One weapon had already been recovered at the scene, from a man just inside the

5

apartment's door.  Officer Pendarvis had no idea whether defendant, too, was armed and whether he was dangerous.  Officer Pendarvis will testify that in his experience, it is highly unusual for suspects encountered during the execution of search warrant to refuse to comply with officers' directions.  When Office Pendarvis finally had defendant on the ground it became clear why defendant had been non-compliant and what he had been fumbling with; defendant had  a loaded gun in his pocket.

Officer Pendarvis and defendant then had a heated verbal exchange.  Officer Pendarvis asked what can best be described as rhetorical questions to which he did not expect an answer.  Officer Pendarvis, adrenaline still rushing from the dangerous encounter, said words to the effect of, why didn't you follow my directions, what the hell were you thinking, and I could've shot you.  An objective observer would plainly recognize that these questions were not likely to elicit incriminating responses about whether defendant had possessed a gun.  That fact was not in dispute; Officer Pendarvis had just located the gun in defendant's pocket.  Though in the form of a question, Officer Pendarvis was essentially scolding defendant for creating such a dangerous situation.  Had Officer Pendarvis been seeking information or an incriminating statement, his questions to defendant would have been very different.  He would have asked questions such as "is this your gun" and "where did you get this gun."  He would not have incredulously asked, "what the hell were you thinking."  Because the statements made by defendant immediately after his arrest were not likely to elicit an incriminating response and were not the result of interrogation, defendant's motion to suppress these statements should be denied.

**B.      Defendant's Statements at the Police Station Should Not Be Suppressed Either.**

Defendant has also moved to suppress two statements he made at the police station after his arrest.  Even if officers had not read defendant his *Miranda* rights while waiting to be transported (which they did), the first statement at the police station, to Officer Pendarvis, was not the result of interrogation because the question was not likely to elicit an incriminating response.  *See Westbrook*, 125 F.3d at 1002.  Officer Pendarvis, the same officer whom defendant had earlier placed in a very dangerous position because of his failure to comply with the officer's instructions, reviewed defendant's criminal history information.  The defendant's criminal history revealed several gun-related convictions.[1]  Bemused, Officer Pendarvis asked defendant words to the effect of, "so you were going to shoot me, huh?"  Defendant replied, in substance, that he was not going to shoot Officer Pendarvis but was moving around and fumbling with his pocket to indicate to the officer that he had a gun.  At the time, there was no dispute that defendant had possessed a gun; Officer Pendarvis found it right in defendant's pocket.  The officer's "question" did not seek any incriminating information, nor was there any reason for Officer Pendarvis to think that he needed to obtain any such information.  Moreover, it is absurd to think that any suspect would answer "yes" to a police officer casually asking whether the suspect was going to shoot him.  Indeed, defendant denied that he was going to shoot Officer Pendarvis.  The nature and tone of the question demonstrates that it was rhetorical and conversational.   No objective observer would believe that a defendant would answer that "question" with an incriminating statement.  The defendant's motion

---

[1]  Before trial, the government will instruct the officers, including Officer Pendarvis, not to reveal in the jury's presence that defendant has multiple gun convictions.  Instead, with the Court's permission, the government will ask a leading question on this specific issue in order to avoid revealing defendant's full criminal history to the jury.

to suppress this statement should be denied.

The government agrees that defendant's statements to Office Kocanda at the police station were the result of custodial interrogation.  Officer Kocanda wanted to ask defendant questions about where he had bought the gun because the Area Two Gun Team investigates individuals who sell illegal guns and attempts to close down their operations.  Officer Kocanda, however, read defendant his *Miranda* rights (for a second time) prior to asking any questions.  It is not necessary that a defendant expressly waive his right to remain silent for questioning to be permissible.  *United States v. Upton*, 512 F.3d 394, 399 (7th Cir. 2008) (a waiver can be express or implied and a person's conduct can show that he has waived his rights).  The Seventh Circuit has found that a defendant can be found to have waived his right to remain silent even after refusing to sign a waiver form.  *United States v. Smith*, 218 F.3d 777, 781 (7th Cir. 2000) (conduct demonstrated waiver of right to remain silent where defendant began talking to agents after refusing to sign waiver form and never requested an attorney or that questioning be stopped).

Office Kocanda will testify that it is his practice always to read suspects their *Miranda* rights at the police station if he is going to ask them any questions and that he did so in this case.  Officer Kocanda will also testify that he customarily reads suspects their rights using a pre-printed form found within the Fraternal Order of Police handbook, copies of which are kept at the police station and issued to every officer.  The last part of the pre-printed *Miranda* warnings ask whether the suspect has understood these rights and whether he is willing to talk to law enforcement.  Officer Kocanda will testify that defendant answered in the affirmative before he was asked any questions and then went ahead and answered the officer's questions.  Under these circumstances, defendant voluntarily waived his right to remain silent.

8

**IV.    Conclusion**

For the foregoing reasons, the government respectfully requests that the defendant's motion to suppress statements be denied.

                                     Respectfully submitted,
                                     PATRICK J. FITZGERALD
                                     United States Attorney

By:    s/ Steven A. Block_____

                                     JULIE B. RUDER
                                     STEVEN A. BLOCK
                                     Assistant United States Attorney
                                     219 South Dearborn Street
                                     Chicago, Illinois 60604
                                     (312) 886-1317

## <u>CERTIFICATE OF SERVICE</u>

The undersigned Assistant United States Attorney hereby certifies that the following document:

Government's Response to Defendant's Motion to Suppress

was served on all counsel of record, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

s/ Julie B. Ruder_____
JULIE B. RUDER
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois
(312) 886-1317